**Robert W. RANKIN, Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

**No. C81–1046.**

United States District Court,
N.D. Ohio, E.D.

Dec. 12, 1983.

David Kolick, Weaver, Kolick, Georgeadis & Ernewein, Philip N. Georgeadis, Cleveland, Ohio, for plaintiff.

Randolph Baxter, Alan J. Ross, Asst. U.S. Attys., Cleveland, Ohio, for defendant.

MEMORANDUM OPINION
AND ORDER

BATTISTI, Chief Judge.

This action comes to the Court under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671, *et seq.,* and the National Swine Flu Immunization Program of 1976 (Swine Flu Act), Public Law 94–380,

---

42 U.S.C. § 247b, *et seq.* The case was previously transferred by the Judicial Panel on Multidistrict Litigation to the United States District Court for the District of Columbia for consolidated pretrial proceedings. *See In Re Swine Flu Immunization Products Liability Litigation,* Final Pretrial Order, MDL Docket No. 30, Misc. No. 78–0040 (D.D.C.1979). It was subsequently transferred back to this Court where a trial to the Court was commenced on August 2, 1983.[1]

Pursuant to Rule 52, Fed.R.Civ.P., the Court makes the findings of fact and conclusions of law which follow. Findings of fact were based on documents entered into evidence and the testimony of the Plaintiff and his wife as well as the sometimes-conflicting expert testimony of doctors who testified in person or via depositions, records of which were provided by the Judicial Panel on Multidistrict Litigation.

### FINDINGS OF FACT

1. Plaintiff, Robert W. Rankin, is a male, approximately 48 years of age.

2. Defendant, United States of America (the Government), during portions of 1976 and 1977 operated, through the Department of Health, Education, and Welfare, a nationwide influenza vaccination program, known as the National Swine Flu Immunization Program, pursuant to the 1976 Swine Flu Act, *supra.*

3. On November 7, 1976 Plaintiff, accompanied by his wife and mother-in-law, went to Parmatown Shopping Center in Parma, Ohio where he received a swine flu innoculation administered under the auspices of the National Swine Flu Immunization Program.

4. Before receiving his innoculation, Plaintiff received and signed a registration form.

5. Several weeks later Plaintiff began to bite his lip while eating.

6. On Christmas Day of 1976 Plaintiff was unable to voluntarily close his left eye.

7. The muscles in the left side of Plaintiff's face progressively deteriorated until, by mid-January of 1977, they were completely paralyzed. Since that time Plaintiff has suffered and continues to suffer complete paralysis of the left side of his face.

8. During the month of January, 1977 Plaintiff was examined by his family physician, Dr. Robert Brooks, who diagnosed Plaintiff's condition as Bell's Palsy.

9. Beginning in July, 1977 and during the next several months, Plaintiff visited the Cleveland Clinic several times and was admitted on three separate occasions. He was examined there by a number of doctors, including Doctors Hanson, Levine, Kinney and Wilbourn. Various treatments and diagnostic procedures were undertaken while Plaintiff was a patient. None was successful in alleviating his left-side facial paralysis.

10. During his first stay at the Cleveland Clinic Plaintiff was examined electromyographically by Dr. Wilbourn. The results of that examination indicated no peripheral nerve impairment other than that of the seventh cranial nerve, which is agreed to be the immediate cause of Plaintiff's facial paralysis.

11. In 1978 Plaintiff filed a claim for damages from his swine flu innoculation which was denied by the United States Department of Justice in 1980.

12. Plaintiff was subsequently examined by Dr. Howard Tucker on May 1, 1981, Dr. Maurice Victor on June 10, 1982, and Dr. Arthur Brickel on February 7, 1983.

13. Guillain-Barre Syndrome (GBS) is a relatively rare inflammatory neurological disorder which affects the peripheral nervous system. *Alvarez v. United States,* 495 F.Supp. 1188, 1194 (D.Colo.1980). Rather than being a single, well-defined disease it is a collection of symptoms. It's exact etiology or cause is unknown. Diagnosis

---

**1.** Title 28 U.S.C. § 2402 provides: "Any action against the United States under section 1346 shall be tried by the court without a jury ..."

of GBS is based on laboratory, electrodiagnostic, and, primarily, clinical findings.

14. Bell's Palsy is a relatively common neurological illness of the peripheral nervous system which impairs the seventh cranial nerve causing unilateral facial paralysis. Its precise etiology is also unknown, although it has been associated with a number of antecedent events.

15. Of the several (at least eight) doctors who examined Plaintiff for his condition, only one, Dr. Howard Tucker, diagnosed him as suffering from GBS. Dr. Tucker opined that Plaintiff suffers from either a monosymptomatic form of Guillain-Barre Syndrome or a mononeuritis secondary to vaccination.

16. Dr. Brickel testified, based on his examination and testing, that Plaintiff suffers from a more widespread neuropathy than Bell's Palsy.

17. The other doctors concluded that Plaintiff suffers from either left-side Bell's Palsy, in particular, or a left-side facial paralysis of unknown cause, in general.

18. Dr. Peter Dyck, editor of *Peripheral Neuropathy*, the leading text on that subject, testified in a deposition for the consolidated pre-trial proceedings that a condition involving only one limb or one nerve (mononeuritic) could not, by definition, support a diagnosis of Guillain-Barre Syndrome.

19. The National Institute for Neurological and Communicative Disorders and Strokes (NINCDS) sponsored an *ad hoc* committee to identify criteria to aid in the diagnosis of Guillain-Barre Syndrome. The NINCDS criteria were established by experts in the field of neurology and reflect the consensus of medical opinion on the diagnostic features of Guillain-Barre Syndrome. They have been so recognized by federal courts throughout the United States in Swine Flu cases. *See e.g., Saxe v. United States*, 577 F.Supp. 135, No. C78–1411A (N.D.Ohio, Aug. 19, 1983); *Warner v. United States*, 522 F.Supp. 87 (M.D.Fla. 1981); *Gicas v. United States*, 508 F.Supp. 217 (E.D.Wis.1981); *Lima v. United States*, 508 F.Supp. 897, 899 (D.Colo.1981);

*Hixenbaugh v. United States*, 506 F.Supp. 461, 464 (N.D.Ohio 1980); *Heyman v. United States*, 506 F.Supp. 1145, 1148 (S.D.Fla. 1981); *Ary v. United States*, Civil Action No. C79–243c (E.D.Okla., Feb. 27, 1981); *Fritschen v. United States*, Civil Action No. C79–1031 (D.Kan., Jan. 14, 1981).

20. According to the NINCDS criteria, the two symptoms or features *required* for a diagnosis of Guillain-Barre Syndrome are:

"A. Progressive motor weakness of more than one limb ... [and]

B. Areflexia (loss of tendon jerks)."

21. In keeping with the NINCDS criteria, Dr. Victor described progressive motor weakness of more than one limb as the *sine qua non* of a diagnosis of Guillain-Barre Syndrome.

22. Plaintiff testified, and the Court so finds, that at no time, either during or after the onset of his facial paralysis, did he experience any weakness or loss of sensation in his limbs. No records of any doctor who examined Plaintiff during the period indicate he suffered any such weakness or loss of sensation.

23. The only indication of abnormality in Plaintiff's reflexes was offered by Dr. Bricker, who testified that he discovered Plaintiff's ankle reflexes to be absent during his examination of Plaintiff in February, 1983. On cross-examination, Dr. Brickel conceded that a significant fraction of the population has no ankle reflexes.

24. All other evidence, including the testimony of Plaintiff's medical expert, Dr. Tucker, indicates that Plaintiff had, during the onset of his facial paralysis, and continues to have normal reflexes. If Plaintiff, in fact, now has no ankle reflexes, the Court finds that to be a condition which has evolved since his examination by Dr. Victor in June, 1982.

25. The best epidemiological evidence available indicates that "other than the Guillain-Barre Syndrome and rare cases of anaphylaxis, no other serious illnesses were associated with [the swine flu] influenza vaccination ..." Retailliau, *et. al., Illness After Influenza Vaccination Re-*

*ported Through A Nationwide Surveillance System.* American Journal of Epidemiology. Vol. III, No. 3:270 (1980). That is, there is no causal relationship or even statistical correlation between receipt of the swine flu innoculation and contraction of any disease or infirmity other than Guillain-Barre Syndrome or anaphylaxis.

## CONCLUSIONS OF LAW

Under the Federal Tort Claims Act, the Government is liable to an injured party for injuries arising from a negligent or wrongful act or omission by its employees if a private person would be liable for the same act or omission under the law of the state where it occurred. 28 U.S.C. §§ 1346, 2674. In order to prevail in this case, the Plaintiff must prove that his paralysis was caused by his swine flu innoculation, that the Government is liable therefore, and that he suffered damages as a result.

Under the terms of the Final Pretrial Order entered by the Multidistrict Court, the Government has stipulated that a Plaintiff who proves he contracted Guillain-Barre Syndrome after receiving a swine flu innoculation need only establish causation and damages, not liability. *See In Re Swine . Flu Immunization Liability Litigation,* Final Pretrial Order, *supra.* Thus, in determining whether the Government is liable in the instant action, the critical issues which the Court must resolve are:

1. Does Plaintiff suffer from the effects of GBS contracted after he received a swine flu innoculation?

2. If so, was the GBS caused by the swine flu innoculation?

3. If Plaintiff did not contract GBS, was the condition from which he has suffered (whatever it is) caused by the swine flu innoculation?

4. If Plaintiff's condition was caused by the swine flu innoculation, is there a theory of liability under which the Government should be held liable therefore?

## I.

■ The primary issue in this case is whether Plaintiff contracted GBS. Because, as noted above, GBS is a collection or constellation of various neurological symptoms and conditions rather than a well-defined organic disorder, there is no single test which can conclusively determine the presence of GBS. The precise characteristics distinguishing it from any other neurological disorders apparently have been historically of little interest or significance outside the academic medical community.

The question of exactly what is or is not GBS might have remained in academic obscurity were it not for the Government's National Swine Flu Program. That program led to a relatively epidemic increase in the number of reported cases of GBS, and to a multitude of claims filed against the Government. Hence, what was once only a matter of academic interest to a small segment of the medical community suddenly became a matter of legal responsibility, involving millions of dollars, and of vital personal interest to thousands of Americans and their Government.

Moreover, what once might have been resolved by the painstaking accretion of knowledge and evolution of scientific understanding is now before the Court for resolution based on the evidence as presented. It is in this respect that the Court addresses the question of whether Plaintiff suffered from GBS, nominally a question of fact, as a matter of law, for it is the *legal* consequence of the Plaintiff's medical condition which the Court must determine.

In such a technical area beyond its own expertise, the Court must necessarily rely on the documentation and expert testimony of the doctors who examined Plaintiff and who speak with some authority on the subject of GBS. Yet the Court is not without guidance in evaluating such evidence. Notwithstanding some criticism, the NINCDS criteria, representing the consensus of the medical community on the diagnostic features of GBS, constitute the single most authoritative source available to the Court on the subject of diagnosing GBS.

Of the two NINCDS criteria listed as required for a diagnosis of GBS, *supra,* Plaintiff made no contention and offered no evidence that he suffered from progressive motor weakness of more than one limb, and presented only the evidence of Dr. Brickel's examination to support a claim of areflexia (loss of tendon jerks). Based on the fact that Dr. Brickel's examination took place in 1983, almost six years after the onset of Plaintiff's condition, and that his findings regarding areflexia were not in keeping with those of any doctor who earlier examined Plaintiff, the Court has found that Plaintiff did not suffer areflexia during the onset of his symptoms, *supra.*

Four of the NINCDS features "strongly supportive" of a diagnosis of GBS are progression of the motor weakness, relative symmetry, cranial nerve involvement, and recovery within several weeks after progression stops. While Plaintiff's facial paralysis (cranial nerve involvement) did "progress" (deteriorate) over time, its presentation was markedly asymmetrical and Plaintiff has experienced no recovery from it. Persistent asymmetry of weakness is described as a feature "casting doubt" on a diagnosis of GBS.

While a comparison of Plaintiff's condition to those NINCDS criteria, particularly the two required for diagnosis of GBS, is almost enough to conclude the point, *see Hunt v. United States,* No. C79-253 (N.D. Ohio April 8, 1982); *Hixenbaugh v. United States, supra,* the Court is also mindful of the diagnoses of the doctors who examined Plaintiff. Only Dr. Tucker was willing to testify that Plaintiff has suffered from GBS. Dr. Tucker's diagnosis was based on a 45-minute examination which took place over four years after Plaintiff's condition arose, and was notably qualified in attributing Plaintiff's condition to either a mononeuritic form of GBS (for which only one authority in the medical literature was cited, *see infra*) or mononeuritis secondary to vaccination. Plaintiff's other medical expert, Dr. Brickel, was only willing to testify that Plaintiff's condition represented a more widespread neuropathy than Bell's Palsy. This diagnosis was based on an

examination which took place in February, 1983.

In contrast, Plaintiff was examined by his family physician, Dr. Brooks, at the time his symptoms arose, and by as many as nine doctors at the Cleveland Clinic within six months thereafter. None of these examining physicians diagnosed his condition as GBS. Throughout their records Plaintiff's condition is referred to as Bell's Palsy or idiopathic (of unknown cause) facial paralysis. Likewise, Plaintiff was examined in 1982 by Dr. Victor who testified unequivocally that Plaintiff suffered from Bell's Palsy and not GBS.

Plaintiff sought to overcome the consequence of these diagnoses by arguing that his symptoms did not match those of Bell's Palsy closely enough to support that diagnosis, or, in the alternative, that Bell's Palsy is really a mononeuritic variant of GBS. As to the latter, Plaintiff's sole evidence was the testimony of Dr. Tucker who relied on a single, forty year old article, the findings of which have not since been reproduced or substantiated, to support his theory. *See* Baker, "Guillain Barre Disease", *The Journal Lancet,* Dec. 1943, p. 384. This theory has not been supported in the academic literature or by clinical neurologists. Dr. Victor testified convincingly that recent pathological findings show Bell's Palsy to be non-inflammatory and, therefore, distinct from GBS, which is inflammatory.

In support of Plaintiff's other approach, his experts testified that his symptoms did not perfectly match the diagnostic features of Bell's Palsy, implicitly asserting that his condition must therefore be GBS. Emphasis was placed on the fact that Plaintiff experienced no recovery, as is typically the case with Bell's Palsy, and that he suffered a sub-acute onset of symptoms rather than the acute onset typical to Bell's Palsy. However, as noted above, total or partial recovery is also common to GBS. While acute onset of symptoms may represent the norm in Bell's Palsy, the sub-acute onset here does not, by itself, preclude the

diagnosis, particularly in view of Plaintiff's unilateral facial paralysis, the dominant feature of Bell's Palsy.

Plaintiff would have the Court reject the consensus diagnosis of several physicians because his symptoms were not identical to the typical case of Bell's Palsy, and at the same time expand the diagnosis of GBS to include his case, notwithstanding the fact that his symptoms do not include either of the two required features. Moreover, attempting to prove that he must have GBS because he may not have Bell's Palsy is not enough. In order to come within the Government's stipulation liability in the Final Pretrial Order of the consolidated proceedings, *supra,* Plaintiff bears the affirmative burden of proving by a preponderance of the evidence that he contracted GBS.

Because of Plaintiff's burden it is not necessary for the Court to conclude that he suffered from Bell's Palsy in order to conclude that he did *not* suffer from GBS. In light of all the evidence, the Court concludes that Plaintiff has failed to prove by a preponderance thereof that he contracted GBS.

## II.

In light of the foregoing conclusion, it is unnecessary to address the question of whether Plaintiff's swine flu innoculation caused him to contract GBS.

## III.

In order to demonstrate that his facial paralysis, whatever it is labelled, provides a basis for recovery against the Government in tort, *see* Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671, *et seq.,* under Ohio Law Plaintiff must establish, by a preponderance of the evidence, a proximate cause for the injury. *Ohio Fair Plan Association v. Arcara,* 65 Ohio App.2d 169, 417 N.E.2d 115 (1979). Toward that end Plaintiff relies primarily on the fact that his medical history was unremarkable prior to receipt of the swine flu innoculation, and that his facial paralysis began several weeks thereafter. Plaintiff's expert, Dr. Tucker, testified that the

proximity in time of the innoculation and onset of symptoms suggests a causal relationship between the two events.

This approach to establishing causation is sharply refuted by the testimony of other doctors, epidemiological data, and holdings of other courts. The live testimony of Dr. Victor along with the deposition testimony of Doctors Peter Dyck, Paul Wehrle, and Sam Kinney all confirm the Court's understanding that temporal proximity emphatically does not imply causality. The science of epidemiology, which uses statistical analysis of large populations to draw associations between a disease and antecedent events, provides empirical evidence of that fact.

A 1971 Mayo Clinic study reported by Dr. Leonard Kurland, Exhibit F, p. 3, indicates that the ambient (background or naturally-occurring) incidence of Bell's Palsy in the general population is about 22.5 per 100,000 per year, and almost 34 per 100,000 in men of Plaintiff's age group. All the doctors who testified on the point, including Dr. Tucker, agreed that there is no known cause for Bell's Palsy. In particular, an exhaustive survey of the world's literature on Bell's Palsy done by Dr. William Karnes of the Mayo Clinic, Exhibit F, p. 2, revealed no instance of unilateral facial paralysis associated with a vaccination.

From the other perspective, a nationwide survey done by Retaillau, *et al., Illness After Influenza Vaccination Reported Though a Nationwide Surveillance System,* American Journal of Epidemiology, Vol. III No. 3:270 (1980), reported that "other than the Guillain-Barre Syndrome and rare cases of anaphylaxis, no other serious illnesses were associated with [the swine flu] influenza vaccination." In particular, there was no measured increase in the incidence of Bell's Palsy as a result of the Swine Flu Program. Yet because almost a quarter of the American population (45 million people) was innoculated, the ambient incidence of Bell's Palsy meant that approximately 225 of those innoculated each week would contract Bell's Palsy, wholly independent of their innoculations.

*See* Kurland, Exhibit H. It appears likely that the Plaintiff was one such unfortunate person. Even if he was not (because his infirmity was not, in fact, Bell's Palsy), Plaintiff offers no evidence to the Court to establish that his condition was caused by the innoculation other than temporal proximity. Conversely, the Government presented evidence indicating that no other illnesses were associated with the vaccine either. *Retailliau, et al., supra.*

It is noteworthy that other "[c]ourts trying swine flu cases have consistently rejected a link between the swine flu shot and illnesses other than GBS". *Saxe v. United States, supra,* pp. 144–145. Similarly, they have refused to accept temporal association between a swine flu vaccination and subsequent illness as a basis for finding causation, *MacEwen v. United States,* 525 F.Supp. 1063 (M.D.Ala.1981); *Spruell v. United States,* No. 79–418C (E.D.Okl. Nov. 3, 1981), as the Sixth Circuit did very recently:

> Nearly 45 million Americans were innoculated against swine flu. It is not surprising that at least one of those 45 million persons should fall ill shortly after the shot was administered. Without more, this proximate temporal relationship will not support a finding of causation.

*Hasler, et al., v. United States,* 718 F.2d 202 at 205 (6th Cir.1983).

Based on the evidence presented and the foregoing legal precedents, the Court concludes that Plaintiff failed to prove by a preponderance of the evidence that his condition was caused by his swine flu innoculation.

### IV.

In light of the foregoing conclusion it is unnecessary to address the question of whether there is a theory of liability under which the Government should be held liable for causing Plaintiff's condition.

### CONCLUSION

Based upon the foregoing the Court concludes that Plaintiff has failed to sustain his burden of proof and, accordingly, holds in favor of Defendant, United States of America.

IT IS SO ORDERED.