Judith SAARI, Plaintiff,

v.

MERCK & CO., INC., SmithKline Beecham Biologicals, and SmithKline Beecham Pharmaceuticals, Defendants.

No. 95–CV–683 RWS.

United States District Court,
N.D. New York.

March 11, 1997.

Judith Saari, Ballston Spa, NY, pro se.

Venable, Baetjer and Howard, L.L.P., Baltimore, MD, for Defendant Merck; Paul F. Strain, Paul D. Barker, Jr., of counsel.

Hallenbeck, Lascell, Norris & Zorn, Rochester, NY, for Defendants SmithKline; Cheryl A. Heller, of counsel.

Whiteman Osterman & Hanna, Albany, NY, for Defendants Alan J. Goldberg, of counsel.

## MEMORANDUM-DECISION AND ORDER

RALPH W. SMITH, Jr., United States Magistrate Judge.

By Order dated November 1, 1996, this matter was referred to the undersigned upon consent of the parties by the Honorable Thomas J. McAvoy, Chief United States District Judge, for all further proceedings and the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73.

## BACKGROUND

In May 1995, plaintiff, through counsel, commenced actions in New York State Supreme Court alleging that she developed [1] arthritis, fatigue, and alopecia (hair loss) [2] as a result of defendants' hepatitis B vaccines which she received on July 29 and August 28, 1992. Defendants timely removed those actions to this court, and the two cases were consolidated by Order dated November 3, 1995. (Doc. 15).

Previously, on August 7, 1995, this court granted plaintiff's attorney's motion to withdraw as counsel for plaintiff and directed plaintiff to advise the court as to her intentions regarding retaining new counsel. (Doc. 7). In a subsequent Order, plaintiff was directed to retain new counsel in advance of the scheduled Rule 16 conference, but in the event she was unable to do so, she was nevertheless to attend the conference pro se. (Doc. 9). Plaintiff subsequently requested, and was granted (Doc. 13), an adjournment of that conference because the law firm she had contacted needed additional time to prepare and to obtain additional medical information and an expert medical witness. (Pl.'s letter of Sept. 21, 1995). When that conference was finally held on November 1, 1996, however, plaintiff appeared pro se. (Doc.

---

1. As pointed out by defense counsel at the depositions of three of plaintiff's doctors, plaintiff had a history dating back to 1984 of painful, swollen finger and toe joints and fatigue. In fact, as recently as six weeks before she received her first hepatitis B vaccine, she complained to her doctor that her hair was dry, had stopped growing, and was breaking off. Furthermore, two weeks before her first shot, she reported to her doctor that she was "still extremely fatigued." This history is in sharp contrast to plaintiff's contention in this litigation and in the histories given to

her doctors that she was well before the vaccines.

2. Plaintiff testified at her deposition that she suddenly had this one centimeter of hair loss within 40 days after the shot. (Pl.'s deposition transcript at 165). Defendants note in their brief that the alleged hair loss has been described by Dr. James Strosberg as 12 millimeters in diameter, which is smaller than the size of a dime. (Ex. B to Aff. of Dr. Strosberg). (Def.'s br. at 5 n. 2).

14). At that time, the court urged plaintiff to retain counsel and advised her that if she continued pro se, she would be required to comply with the rules of practice and procedure governing federal litigation. (See Doc. 20).

Following that conference, a Uniform Pretrial Scheduling Order was filed in which, inter alia, plaintiff was directed (1) to identify any and all experts who are retained or specially employed to provide expert testimony in the case, and (2) unless waived to serve on the defendants the expert's written report pursuant to Fed.R.Civ.P. 26(a)(2)(B) no later than 90 days prior to the discovery deadline of July 31, 1996. (Doc. No. 16). While that Order did not require the production of such reports by treating physicians, it did provide that "[i]f a treating **physician** is expected to be called as a witness, he or she must be identified **at least 90 days prior to the close of discovery.**" (Doc. 16) (emphasis in original).

Despite that clear Order, plaintiff did not provide any expert reports prior to the May 1, 1996, deadline. Consequently, following a discovery conference on June 6, 1996, this court issued an Order which, inter alia, directed that plaintiff would be "precluded from calling any experts other than those treating physicians whose names she has disclosed in response to interrogatories." (Doc. 19). However, in an effort to give plaintiff every opportunity to provide evidentiary support for her claim (see Doc. 20), the court further directed in that Order that

> [a]s to each of those treating physicians whom she intends to call, plaintiff must submit a letter signed by each such treating physician no later than July 1, 1996, stating the physician's willingness to appear as a witness both at trial and at a pretrial deposition, if necessary, as well as a synopsis of the physician's intended testimony specifying whether the physician's opinion is being given solely as a treating physician or as a potential expert on the issue of causation of plaintiff's alleged injury by the hepatitis-B vaccine. **If plaintiff fails to ensure that such a signed letter is provided by July 1, 1996, she shall be precluded from calling said physician as a witness.[3]**

(Doc. 19) (emphasis added). That Order further provided, inter alia, that

> [a]s to any report, declaration or other information provided by non-treating physicians, plaintiff may submit such information to counsel for defendants by July 1, 1996, together with a letter from each person stating his or her knowledge of plaintiff's claim. **Such information does not appear at this time to be admissible in any respect at a trial of this matter but is being permitted inasmuch as plaintiff is acting pro se. Plaintiff is advised, however, that this information is highly unlikely to play any role in this action.**

(Doc. 19) (emphasis added).

Plaintiff made a telephonic request for an additional sixty days in which to provide the physician statements and other written documentation, claiming a recent move and the condition of her health as justification. (See Doc. 20). In an Order dated June 27, 1996, the court noted that despite the passage of more than one year, little, if any, progress appeared to have been made by plaintiff in prosecuting her claim. (Doc. 20). The court further stated that it had

> extended every consideration to plaintiff as required for one acting pro se. However, it is essential that this action proceed expeditiously both for the sake of the defendants and to ensure that the court's business is handled in expedient fashion. Plaintiff has not specified any efforts expended to date to comply with this court's order of June 4, 1996. Moreover, neither her relocation nor her claimed medical condition should have prevented her from communicating by mail or telephone with her treating physicians and those persons described in paragraph 2 of that order.

(Doc. 20). However, in deference to plaintiff's pro se status, by that Order the court extended plaintiff's time to August 1, 1996, to produce the treating physician letters and

---

**3.** Plaintiff was also advised orally during the discovery conference that if she failed to provide such letters, she would be precluded from calling those physicians as witnesses. (Doc. 20).

the other documentary evidence provided for in the earlier Order. (Doc. 20).

Nonetheless, on that August 1 deadline, plaintiff again telephoned chambers [4] essentially asking for additional time to submit the required letters. In view of the previous extension and the lateness of this extension request, she was given only to the next morning to send them to chambers by facsimile. The next day, just three letters were faxed to the court, along with some supporting medical documentation. Thereafter, on August 5, 1996, the court received a packet of documents from plaintiff which included copies of the same items as well as unsigned letters from two additional doctors (Kremer and Greenstein), more supporting documentation, and a copy of discovery responses apparently sent to defense counsel in December 1995.

Inasmuch as defense counsel did not timely receive the doctors' letters, a telephone conference was conducted on August 12, 1996, following which an Order was issued by this court which directed that "plaintiff shall be precluded from calling Doctors Greenstein and Kremer. The letters plaintiff submitted on their behalf are unsigned and thus do not comply with the court's previous Order." (Doc. 24) (footnote omitted). The Order further provided "that given the liberality that is to be afforded to pro se litigants, the court will consider Dr. James Yovanoff to be a 'treating physician,' and thus plaintiff will be permitted to call him as a witness, and defendants may very well wish to depose him as

well as the other two treating doctors." [5] (Doc. 24). Furthermore, defendants were directed to schedule the discovery depositions of plaintiff's treating physicians forthwith. (Doc. 24).[6] Those depositions were conducted, full transcripts of which, as well as that of plaintiff's deposition, were filed by defendants pursuant to the court's Order of February 20, 1997. (Doc. 39). Upon defendants' request, discovery [7] has been stayed pending the submission and disposition of the motion now before the court. (Doc. 26).

## DISCUSSION

Presently before the court is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 on the ground that plaintiff has not produced legally sufficient evidence that her alleged injuries were caused by defendants' hepatitis B vaccines. (Docs.29–35). The pro se plaintiff filed opposition to that motion in which she requests a "judgement [sic] for settlement" in the amount of $52,000 per year for thirty years (her alleged life expectancy) from each of the defendants. (Doc. 36).

With leave of court, which is required by Local Rule 7.1(b)(2), defendants filed a brief reply memorandum. (Doc. 37). Thereafter, without leave of court, plaintiff submitted a letter in response to defendants' reply, which precipitated yet another round of letters from defendants (Doc. 38) and plaintiff.[8]

"[P]roperly employed, summary judgment is a useful device for unmasking frivolous

---

**4.** This call was in contravention of the court's previous Order that plaintiff was "to have no further communication with this court except in written form addressed to counsel for defendants." (Doc. 20).

**5.** Plaintiff's deposition was taken on May 22, 1996, not even three months before this conference. A close review of her deposition transcript shows that this designation of Dr. Yovanoff as a treating physician was, in fact, liberal. During questioning concerning the decision on plaintiff's claim for social security disability insurance benefits, plaintiff testified that the decision was based upon the records of Dr. O'Connell and other doctors. When asked, "What other doctors," plaintiff answered, "Dr. Yovanoff, rheumatologist. I see he is not listed in here because **he is not really a treating—he was a consulting physician**." (Pl.'s dep. at 85) (emphasis added).

**6.** That Order also extended defendants' time to complete their expert disclosure and scheduled an independent medical examination of plaintiff.

**7.** The only discovery remaining would be defendants' expert disclosure. The deadline for that disclosure had previously been extended several times. (Doc. 20 [extended to September 16, 1996]; Doc. 24 [extended to 45 days after the completion of discovery deposition of plaintiff's treating physicians]; Doc. 25 [extended to November 9, 1996]). The general discovery deadline of July 31, 1996, which was set in the original Uniform Pretrial Scheduling Order (Doc. 16), however, has never been extended.

**8.** The substance of the latter two letters have no relevance to the instant motion and thus will not be discussed further.

claims and putting a swift end to meritless litigation." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980). The standard for granting a motion for summary judgment is very well-established. *Leiching v. Consolidated Rail Corp.*, 901 F.Supp. 95, 97 (N.D.N.Y.1995). Such a motion shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

Significantly, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "Where the nonmoving party fails to make such a showing, [t]he moving party is 'entitled to a judgment as a matter of law' ..." *Id.* at 322–23, 106 S.Ct. at 2552 (quoting *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511). Moreover, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2552.

Furthermore, "a party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'" *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir.1995) (citations omitted); *Montessi v. American Airlines, Inc.*, 935 F.Supp. 482, 485 (S.D.N.Y.1996). *See Burke v. Warren County Sheriff's Dep't*, 890 F.Supp. 133, 137 (N.D.N.Y.1995) ("To survive the motion for summary judgment the nonmovant must do more than present evidence that is merely colorable, conclusory, or speculative...."). The nonmoving party

must show more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "However, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party, and it may not properly grant summary judgment where the issue turns on the credibility of witnesses." *Leiching*, 901 F.Supp. at 97 (citing *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir. 1994)).

■ After a very careful review of all of the papers submitted, including the more than 600 pages of deposition transcripts, defendants' motion shall be granted. With the exception of the production of defendants' expert reports, discovery in this case is closed.[9] Nonetheless, plaintiff has failed to carry her burden of proving an essential element of all of her claims,[10] namely that defendants' vaccines caused her alleged injuries. As shown below, plaintiff has submitted evidence that is at most "colorable, conclusory, or speculative," which is inadequate to defeat a summary judgment motion. *Burke*, 890 F.Supp. at 137. *See Montessi*, 935 F.Supp. at 486 ("[T]he bald statement ... that [plaintiff] is suffering ... ailments 'as a result of the ... incidents' complained of—is the epitome of a legal conclusion and thus insufficient to establish a genuine issue of material fact for trial.").

The court notes that in her opposition papers (Doc. 36) plaintiff contends that given her pro se status, she cannot "'legally' evidence a case." She thus objects to defendants' assertion that she "has not produced legally sufficient evidence that her alleged injuries were caused by the defendants [sic] hepatitis B vaccines". [sic] (Doc. 36 at 1). Plaintiff asserts that she

> is not acting as a "legal" representative of this Court, but as "Pro Se". [sic] Plaintiff asks the Court to recognize what that

---

**9.** See footnote 7 above.

**10.** Plaintiff asserts causes of action of negligence, breach of warranty, and strict liability. A review

of her two complaints readily shows that for each cause of action, she alleges that defendants' vaccines caused her alleged injuries.

means. Plaintiff is not in the capacity to "legally" produce. Plaintiff has, however, "Pro Se" produced sufficient evidence to allow the Court to rule for a settlement judgement. Plaintiff has presented adequate proof of causal relationship between the defendants [sic] hepatitis B immunizations and the plaintiffs [sic] subsequent injuries and losses from the mentioned immunizations. . . .

Plaintiff asks the Court to rule that Plaintiff did in fact show a causal relationship as "Pro Se", and not as "legal" counsel.

(Doc. 36 at 2). While the court certainly recognizes the difficulties encountered by pro se litigants who are not well-versed in substantive and procedural law,[11] plaintiff is required to comply with the procedural rules. The Second Circuit has made it clear that

[a]lthough pro se litigants should be afforded latitude, see *Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972) (per curiam), they "generally are required to inform themselves regarding procedural rules and to comply with them," *Edwards v. INS,* 59 F.3d 5, 8 (2d Cir.1995). This is especially true in civil litigation. *See McNeil v. United States,* 508 U.S. 106, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) (suggesting that procedural rules in ordinary civil litigation should not be "interpreted so as to excuse mistakes by those who proceed without counsel"). Moreover, this is not a case where a pro se litigant has stumbled into a snare found only in our case law.

*LoSacco v. City of Middletown,* 71 F.3d 88, 92 (2d Cir.1995). In fact, during the November 1, 1996, Rule 16 conference, this court clearly advised plaintiff that if she continued pro se, she would be required to comply with the rules of practice and procedure governing federal litigation. (See Doc. 20).

As the background outlined above establishes, this court has essentially bent over backwards to give the pro se plaintiff the opportunity to present some evidence to support her claims. Nevertheless, as shown below, she has failed to overcome defendants' motion.

■ Defendants correctly assert that it is elementary that causation is a requisite element of proof under each of plaintiff's alleged causes of actions and that regardless of whether the claim is for negligence, breach of warranty, or strict liability, she must first establish that defendants' vaccines were the proximate cause of her alleged injuries. *Lindsay v. Ortho Pharm. Corp.,* 637 F.2d 87, 90–91 (2d Cir.1980) (applying New York Law) ("A plaintiff who seeks recovery for an injurious side effect from a properly manufactured prescription drug must prove that the drug caused her injury. . . ."); *Samuels v. American Cyanamid Co.,* 130 Misc.2d 175, 495 N.Y.S.2d 1006 (N.Y.Sup.Ct.1985) (Plaintiff bears the burden of proof on the issue of whether the vaccines actually caused the claimed injuries). *See Fane v. Zimmer, Inc.,* 927 F.2d 124, 131 (2d Cir.1991); *Montessi,* 935 F.Supp. at 487.

■ Furthermore, defendants are also correct in their contention that in a case such as this where there are complex medical issues, in order for plaintiff to prove that her alleged injuries were caused by defendants' products, she must introduce expert medical testimony establishing causation.[12] *See Fane,* 927 F.2d at 131 ("While expert testimony with reference to proximate causation is not always required," when the issue of causation in a complicated medical case is one beyond the sphere of the ordinary jury, expert testimony is required.); *Rohrbough v.*

---

**11.** Based upon this recognition, the court strongly and repeatedly encouraged plaintiff to retain substitute counsel.

**12.** As correctly noted by defendants (Def.'s br. at 9), Dr. James Noonan, plaintiff's internist, testified that he considers plaintiff's condition and its cause to be beyond his knowledge and expertise, and he was unwilling to express any opinion regarding the cause of plaintiff's complaints. (Noonan deposition transcript at 75, 92, 93, 142).

Based upon this testimony, defendants convincingly contend that if the facts in this case are not even within the common knowledge and experience of a medical doctor, such as Dr. Noonan, who is trained in internal medicine, they certainly are beyond the experience of a layperson. Accordingly, expert medical proof is necessary in this case for plaintiff to establish that defendants' vaccines caused her alleged injuries.

*Wyeth Labs., Inc.*, 916 F.2d 970, 972 (4th Cir.1990) ("An essential element of plaintiffs' cause of action is proof that defendant's vaccine caused plaintiffs' injuries, and proof of causation must be by expert testimony"); *Krasnopolsky v. Warner–Lambert Co.*, 799 F.Supp. 1342, 1348 (E.D.N.Y.1992) ("Notably, the [plaintiffs] have failed to submit any type of expert proof, in an affidavit or otherwise, which would establish any causation between [plaintiff's] injury and the alleged negligence of [defendant]."); *Meiselman v. Crown Heights Hosp.*, 285 N.Y. 389, 34 N.E.2d 367 (1941) ("Ordinarily, expert medical opinion evidence, based on suitable hypotheses, is required, when the subject-matter to be inquired about is presumed not to be within common knowledge and experience and when legal inference predominates over statement of fact ...; but where the matters are within the experience and observation of the ordinary jurymen from which they may draw their own conclusions and the facts are of such a nature as to require no special knowledge or skill, the opinion of experts is unnecessary.").

Plaintiff, however, has not produced any expert medical proof which shows by a preponderance of the evidence that defendants' vaccines caused her alleged injuries. Rather, as shown more fully below, the three treating physicians she designated in her interrogatories and for which she submitted letters as required by the Order dated June 6, 1996 (Doc. 19), could not express an expert opinion establishing a cause and effect relationship between her complaints and the hepatitis B vaccines.[13]

### Dr. James Noonan

In response to the court's June 6, 1996, Order, on August 2, 1996, plaintiff had three signed letters dated August 1, 1996, faxed to the court.[14] The first letter, signed by Dr. James M. Noonan, merely states:

I have been asked by my patient, Judith A. Saari to provide the court with the following statements:

1) I will testify as a witness for the plaintiff in the above referenced action.

2) I will testify in reference to a report filed on 8/18/93. Notification to the Food and Drug Administration Medical Watch Program documents the patient's symptoms as an adverse reaction to the Hepatitis B immunization.

As this patient's physician, I did not treat Ms. Saari for any arthritis related condition prior to her Hepatitis B immunization.

(Doc. 22). Accompanying that letter were copies of the doctor's VAERS report and two subsequent form letters from the VAERS staff regarding the "suspected reaction."

Dr. Noonan was deposed on September 25, 1996. He testified that he is an internist, is board certified in internal medicine but not rheumatology, has no special knowledge of rheumatology except for that which would be expected of a general internist, and has no expertise in researching vaccines. (Noonan deposition transcript at 18, 24–25, 30). He did not see plaintiff immediately after the vaccines and did not personally observe the symptomatology she said she experienced after the shots. (Tr. at 91–92). Rather, the first time he saw plaintiff following the vaccinations was not until May 26, 1996, almost ten months after her first dose. (Tr. at 98).

Dr. Noonan referred plaintiff to Dr. Yovanoff, a rheumatologist, because he did not have "any experience in this sort of a more complicated rheumatologic disease and needed a specialist." It was out of his realm. (Tr. at 75–76).

Dr. Noonan testified that his participation in this case is limited to the fact that he

---

13. Defendants correctly note that none of plaintiff's three designated experts is a dermatologist, nor did they treat her for her alleged hair loss or express an opinion about the cause of that alleged injury. Consequently, plaintiff does not have any expert causation testimony to support her alopecia claim, and, therefore, defendants are entitled to summary judgment on that claim.

14. As made evident in the deposition testimony, plaintiff herself wrote the three letters and merely had the doctors copy them onto their letterhead, sign them, and fax them to the court. This procedure is also evident from the fax cover sheets to the doctors which direct the doctors to **"PLEASE COPY ONTO YOUR LETTERHEAD HAVE THE DOCTOR SIGN AND FAX TO: JUDGE RALPH W. SMITH."** (emphasis in original).

submitted reports to the FDA Med Watch program about a potential adverse reaction. (Tr. 79). He made that report based upon what plaintiff told him. He did not speak with any of plaintiff's other treating doctors to prepare the report, and he did not arrive at any independent conclusion with respect to the report. (Tr. at 78–79, 91). His report to the FDA was simply a report of what plaintiff told him about what she believed her reaction was to the vaccine, and by making that report he was neither confirming nor denying that there is any relationship between her symptoms and the vaccine. (Tr. at 142).

Significantly, Dr. Noonan has no other opinions to express in this litigation and will not be rendering any expert testimony with respect to a definitive link between the vaccine and any arthritic conditions. (Tr. at 79, 92–93). Furthermore, he agreed that he was not making any statement to a reasonable degree of medical certainty regarding the cause of plaintiff's current health situation. (Tr. at 142). He merely opined, in response to a question from plaintiff, that "[t]here is a **possibility** that the reaction **may be** from the Hepatitis B vaccine." (Tr. at 139) (emphasis added). In addition, after defense counsel recited some of plaintiff's past medical history, Dr. Noonan agreed that it would cast some doubt in his mind upon the cause of plaintiff's complaints following the vaccine. (Tr. at 104–05). He stated that he would "have to sit down and look at those symptoms again, but it does cause a little bit of concern." (Tr. at 105).

### Dr. Maurice J. O'Connell

Plaintiff's case does not fare much better from the testimony of Dr. Maurice J. O'Connell. As part of her response to the court's June 6, 1996, Order, plaintiff had a letter faxed to the court dated August 1, 1996, which was signed by Dr. O'Connell and stated:

I have been asked by my patient, Judith A. Saari, to provide the court with the following statement:

1) I will testify as a witness for the plaintiff, Judith A. Saari in the above referenced action.

2) I will attest to the medical treatment and medical records, some of which are enclosed. My testimony will be as a treating physician for the symptoms, findings and treatment of Rheumatoid Arthritis or reactive arthritis subsequent to the administration of Hepatitis B vaccine.

(Doc. 22). Clearly, this letter does not establish the vaccines as the cause of plaintiff's alleged injuries. Furthermore, as shown below, Dr. O'Connell's testimony at his deposition on September 26, 1996, also fails to shed any definitive light on this issue.

Dr. O'Connell is also an internist who is board certified in internal medicine, but not rheumatology or immunology. (O'Connell deposition transcript at 10). He testified that he would not testify as an expert in this case, noting that "she is seeing some real experts; Joe Kremmer [sic] and Yovanoff. And I wouldn't compare myself to them as far as rheumatologists." (Tr. at 60–61. See Tr. at 90–91). He would not be comfortable disagreeing with any conclusions those doctors might reach in this case. (Tr. at 91).

The first time Dr. O'Connell saw plaintiff after the hepatitis B vaccines was not until more than a year later on September 16, 1993, at which time she complained of painful joints, stiffness, pain, and swelling in her hands, morning stiffness, and fatigue, and she claimed she had developed symptoms after the injection and still had them. (Tr. at 44–46, 51). In his office notes written at that time he wrote, "My guess is after all of this time that she is probably disposed to develop rheumatoid arthritis anyway and the vaccine may have brought it on." (Tr. at 53). He agreed that by the use of the word "may" he had not yet come to a definite conclusion as to what was causing plaintiff's arthritic complaints. (Tr. at 53).

Dr. O'Connell's initial belief that there could be a link was based upon the history plaintiff gave him of a temporal relationship between the vaccine, the development of the symptoms, and his knowledge of an associated arthritis occurring in some cases of people who actually had the hepatitis B virus (not the vaccine). (Tr. at 84–85). Nonetheless, other than some unspecified case reports of

some chronic cases of arthritis, he admitted that he was unable to point to anything (medical studies or medical literature) that with a reasonable degree of medical certainty would link the hepatitis B vaccination to permanent arthritic complaints. (Tr. at 85).

Significantly, Dr. O'Connell agreed that he could not with a reasonable degree of medical certainty say that there is a definite link between the hepatitis B vaccination and a permanent arthritis condition. (Tr. at 88–90). Furthermore, he also agreed that there is a possibility that plaintiff's arthritic condition could have preexisted the vaccination. (Tr. at 89–90). While in response to a question from plaintiff he stated that his diagnosis was "[r]eactive arthritis resulting from the Hepatitis B vaccine injection" (Tr. at 92),[15] he nevertheless also agreed that that diagnosis was based on the history plaintiff gave him, his findings on exam, and the temporal relationship that she related to him between the vaccine and the onset of her symptoms. (Tr. at 92–93). He admitted that the causation part of that diagnosis was based upon the temporal relationship. (Tr. at 93).

### Dr. James Yovanoff

The third letter faxed to the court on plaintiff's behalf was signed by Dr. James Yovanoff. This letter of August 1, 1996, states:

> I have been requested by my patient, Ms. Saari, to provide information to the court related to her treatment. She has been under my care for arthritis and alopecia following Hepatitis B Immunization on the following dates:
>
> 7/29/92 #1 Vaccine Recombivax HB (Merck & Co., Inc.)
>
> 8/28/92 #2 Vaccine Engerix B (Smith-Kline & Beecham)
>
> I am willing to appear as a witness for the plaintiff in the above action. I will testify as to my report of 3/14/94:

She appears to have polyarthritis with some minimal synovitis. This **seems** to have developed incident to Hepatitis B vaccination. I was unable to identify any literature to support [chronic][16] arthritis after Hepatitis B vaccination. Nevertheless, her symptoms seem to have developed following this vaccination, so, at this point, I will consider her to **probably** have polyarthritis related to it.

(Doc. 22) (emphasis added).

Dr. Yovanoff's testimony at his deposition on September 16, 1996, however, reveals that this letter, which plaintiff prepared for his signature, contains three significant, and possibly misleading, errors. First, the letter incorrectly states that he treated plaintiff for alopecia. (Dr. Yovanoff's deposition transcript at 63). Second, the letter erroneously states that plaintiff "appears to have polyarthritis," which is an **objective** diagnosis of inflammation in the joints. The letter should have read "appears to have polyarthralgias," which is a **subjective** complaint/symptom of painful joints. (Tr. at 20, 64). Finally, while the letter implies that the doctor observed "some minimal synovitis" (swollen joints), he testified that that statement was based upon the history given by plaintiff. (Tr. at 45, 48, 85).

Dr. Yovanoff saw plaintiff on just two occasions, July 20, 1993, which was almost a year after her first hepatitis vaccine, and March 14, 1994. (Tr. at 18–19, 30, 89). Plaintiff reported to him that she was well until she received the two vaccines. (Tr. at 21). She complained of extreme fatigue as well as pain in her fingers, elbows, shoulders, hips, knees, and feet. (Tr. at 21–22). Despite these complaints, Dr. Yovanoff found all of plaintiff's upper and lower extremity joints to be normal, did not see any swollen, deformed joints, and noted that plaintiff had full mobility in her finger joints. (Tr. at 36, 38). X-rays of her hands were normal, showing no joint damage or other arthritic disorder. (Tr. at

---

15. In fact, plaintiff submitted just this one page of the deposition transcript for the court's consideration. (Pl.'s letter of March 3, 1997).

16. The doctor stated in essence at his deposition that the word "chronic" should have been included. (Dr. Yovanoff deposition transcript at

85–86). The two articles he produced at his deposition regarding arthritis following hepatitis B vaccines, however, concerned acute, not chronic, arthritis. (Tr. at 86–88). Moreover, he agreed that plaintiff's condition could not be described as "acute." (Tr. at 88).

54–55). Her hips, knees, and ankles all had full range of motion without effusions or tenderness. (Tr. at 39). Significantly, he described her exam as "remarkably benign," which he stated meant was "absolutely benign," "completely nominal," or "very normal examination." (Tr. at 46). There was no evidence of any active disease, meaning he could not find any arthritic swelling or inflammation in her joints. (Tr. at 47, see tr. at 67).

After defense counsel reviewed some of plaintiff's prior medical history, Dr. Yovanoff stated that "[i]t sounds as though she had several years of ongoing joint related complaints" and that "it would require reassessment of her diagnosis." (Tr. at 83, 84). Moreover, toward the end of his deposition, Dr. Yovanoff stated that he could "not state with a medical degree of certainty that her entire condition as recounted over several years going back to 1984 is causally related to Hepatitis B, but at the same time I can't say with any medical certainty that Hepatitis B played no role in her symptoms either." (Tr. at 92). He also agreed that symptoms of joint pain and fatigue could be caused by hundreds of different disease processes. (Tr. at 95).

Furthermore, Dr. Yovanoff significantly agreed that the reason he referred to the vaccine in his impressions after his two examinations was because plaintiff indicated to him that her symptoms started after she had the vaccine. (Tr. at 97). In other words, it was just the temporal association to the vaccine she had reported that was the reason for his reference (Tr. 97), and there was nothing at all "about her condition, [his] findings of her condition, [his] examination, or her reports that would, other than the temporal association, that would point to the vaccine as being the culprit." (Tr. at 97–98).

### A Mere Temporal Relationship is Insufficient

■ It is clear from the deposition transcripts that none of the three doctors could say with any degree of medical certainty that the defendants' vaccines were the cause of plaintiff's purported injuries. At most, the only connection between the two was the temporal relationship plaintiff reported to

them. Defendants correctly note that courts considering other vaccine cases have repeatedly held that a temporal association between an alleged injury and a vaccination is insufficient evidence to support a finding of causation in fact. *E.g., Grant v. Secretary of the Dep't of Health and Human Servs.,* 956 F.2d 1144, 1149 (Fed.Cir.1992); *Rohrbough v. Wyeth Labs., Inc.,* 916 F.2d 970, 974 (4th Cir.1990) (Doctor's deposition testimony only established "that a *temporal* link existed in other cases between the vaccine and a reaction like that displayed by [plaintiff]." The doctor "did not testify that the literature supported a *causal* link between the vaccine and the reaction in other cases, much less that the vaccine caused the reaction in this particular case."); *Hasler v. United States,* 718 F.2d 202, 205 (6th Cir.1983), *cert. denied,* 469 U.S. 817, 105 S.Ct. 84, 83 L.Ed.2d 31 (1984); *Zuchowicz v. United States,* 870 F.Supp. 15, 19 (D.Conn.1994); *Rankin v. United States,* 578 F.Supp. 840, 846 (N.D.Ohio 1983). Such a holding is equally appropriate here. To find otherwise would be to permit plaintiff to support her claims on mere conjecture. As stated earlier in this decision, "a party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'" *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1456 (2d Cir.1995) (citations omitted); *Montessi v. American Airlines, Inc.,* 935 F.Supp. 482, 485 (S.D.N.Y.1996). *See Burke v. Warren County Sheriff's Dep't,* 890 F.Supp. 133, 137 (N.D.N.Y.1995) ("To survive the motion for summary judgment the nonmovant must do more than present evidence that is merely colorable, conclusory, or speculative...."). Accordingly, the court finds that defendants are entitled to summary judgment.

### Plaintiff's Other Evidence

■ Even if expert medical proof of causation were not required in a case of this kind, plaintiff's other submissions in opposition to defendants' motion are also insufficient to establish causation. More specifically, plaintiff has submitted the following as supporting evidence: reports of Doctors Neilson, Sharrer, Kremer, and Greenstein; favorable deci-

sions on her claims for Worker's Compensation and social security disability insurance benefits; plaintiff's unsworn interrogatory responses; a document dated June 1, 1995, purportedly written by FDA Dr. Robert Wise entitled "The Federal Vaccine Adverse Event Report System. An Epidemiologic Overview of VAERS;" an unsworn transcript of a alleged conversation with Dr. Wise; a VAERS report which was filed by Dr. Noonan listing plaintiff's purported reaction to defendants' immunization; a pathology report dated June 9, 1993, with an accompanying letter from Dr. Joel Koransky; and various pieces of medical literature. It is readily apparent, however, that this additional evidence is not admissible and/or not probative of the issue of causation, and, therefore, it cannot defeat defendants' motion. "Material in a form not admissible in evidence may be used to *avoid*, but not to *obtain* summary judgment, **except where an opponent bearing a burden of proof has failed to satisfy it when challenged after completion of relevant discovery.**" *Tetra Techs., Inc. v. Harter*, 823 F.Supp. 1116, 1120 (S.D.N.Y. 1993) (emphasis in bold added). *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

For example, based upon the court's Orders of June 6, 1996 (Doc. 19), and August 12, 1996 (Doc. 24), the court will not consider the unsworn reports from Doctors Neilson, Sharrer, Kremer, and Greenstein.[17] In fact, the latter Order specifically provided that "plaintiff shall be precluded from calling Doctors Greenstein and Kremer. The letters plaintiff submitted on their behalf are unsigned and thus do not comply with the court's previous Order." (Doc. 24) (footnote omitted).

Furthermore, the favorable decisions concerning plaintiff's claims for Worker's Compensation benefits and social security disability insurance benefits [18] (Pl.'s docs. 7 & 8) clearly have no probative value in the instant case, and the principles of res judicata and collateral estoppel obviously do not apply. *See Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457–58 (2d Cir.1995) (Specifying the conditions that must be met in New York to prevent relitigation in the second action).

In addition, the unsworn transcript of a purported conversation with FDA Dr. Robert P. Wise is clearly inadmissible hearsay. (Pl.'s doc. 10). Furthermore, the document he apparently authored, which is dated June 1, 1995, and entitled "The Federal Vaccine

17. Even if plaintiff had timely submitted a signed letter from Dr. Greenberg, his report nevertheless would in all likelihood be precluded pursuant to the court's June 6, 1996, Order (Doc. 19), as he apparently was not a treating physician, but rather was a Worker's Compensation doctor. (Pl.'s deposition transcript at 171). Furthermore, a close review of his report does not necessarily provide the support plaintiff is seeking. He states therein that "[a]lthough I feel that there is a causal relationship to the July 29, 1992 incident, as stated in the above report I have to raise question as to whether or not there could be an underlying pre-existing arthritic condition that could be playing a role."

Similarly, Dr. Kremer also does not appear to be a treating physician as he apparently saw plaintiff on just one occasion. Furthermore, his report is also not definitive on the issue of causation. His assessment merely states, "Mild polyarthritis which followed chronologically after a hepatitis B immunization." Once again, this is merely a temporal relationship which is insufficient to establish causation in fact.

18. Although not relevant to today's decision, the court notes that given the substantial weight the Commissioner of Social Security usually places upon the opinions of treating physicians, *see, e.g.*,

20 C.F.R. § 404.1527(d)(2); *Schisler v. Sullivan*, 3 F.3d 563 (2d Cir.1993), in view of some of the deposition testimony in this case, plaintiff is indeed very fortunate to have received a favorable SSDIB decision. For example, Dr. Noonan testified that based on what he observed during his last examination, "there was nothing that would obviously prevent [plaintiff] from working." (Tr. at 96).

While not a treating physician, Dr. Yovanoff similarly stated that "I think that she could be employed in suitable employment. I didn't find evidence that she was totally unemployable." (Tr. at 94). In addition, his opinion concerning plaintiff's residual functional capacity would not necessarily support a disability determination. (Defs.' Ex. N) (finding an ability to lift and carry up to five pounds, stand and/or walk up to six hours, sit without limitation, but with limitations on repeated grasping, pushing, pulling, and squeezing). Furthermore, at his deposition, Dr. Yovanoff described plaintiff's exam as "remarkably benign," which he stated meant was "absolutely benign," "completely nominal," or "very normal examination." (Tr. at 46). There was no evidence of any active disease, meaning he could not find any arthritic swelling or inflammation in her joints. (Tr. at 47, see tr. at 67).

Adverse Event Reporting System. An Epidemiologic Overview of VAERS," (Pl.'s doc. 10) provides no proof of causation. While plaintiff claims this report confirms her hair loss reaction to the vaccines, that is not a fair reading of the report. Plaintiff is never mentioned in the report. In addition, the report contains certain "Caveats to Interpretation" which significantly include the following: "Reports only describe sequence: vaccine *exposure* followed by *adverse event*" and "Often impossible to assess from individual report whether vaccine(s) played role." (Pl.'s doc. 10) (emphasis added).

Furthermore, Dr. Noonan's VAERS report concerned just a **potential** adverse reaction. (Noonan's deposition transcript at 79). According to the doctor's testimony, he made that report based upon what plaintiff told him. He did not speak with any of plaintiff's other treating doctors to prepare the report, and he did not arrive at any independent conclusion with respect to the report. (Tr. at 78–79, 91). His report to the FDA was simply a report of what plaintiff told him about what she believed was her reaction to the vaccine, and by making that report he was neither confirming nor denying that there is any relationship between her symptoms and the vaccine. (Tr. at 142).

In addition, the pathology report dated June 9, 1993, and the accompanying letter from Dr. Joel Koransky, are also of no moment. Significantly, that letter states that plaintiff "has a cicatricial alopecia of the scalp vertex, **probably** lichen planopilaris (lichen planus of the scalp). **This is temporally related to the series of Hepatitis B immunizations she received.** *Although they are temporally related, it is not possible to prove that they are causally related.*" (emphasis added). (Pl.'s doc. 12).

## CONCLUSION

In sum, the court finds that defendants are entitled to the entry of summary judgment. Discovery is essentially closed, yet plaintiff has failed to make a showing sufficient to establish the existence of an element essential to her case on which she would bear the burden of proof at trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

Based upon the findings above, it is unnecessary to address defendants' *Daubert* [19] arguments.

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED,** that defendants' motion for summary judgment is **granted.** It is thus

**ORDERED,** that the Clerk of the Court enter judgment for the defendants. It is further

**ORDERED,** that the Clerk of the Court serve a copy of this decision upon the parties by regular mail.

**IT IS SO ORDERED.**

**19.** *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).